555 A.2d 185

**COMMONWEALTH of Pennsylvania**

v.

**Richard Alan SMITH, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 14, 1988.

Filed March 1, 1989.

---

290

Gregory Cecchetti, Assistant Public Defender, New Kensington, for appellant.

Judith Karns–Ciszek, Assistant District Attorney, Ligonier, for Com., appellee.

Before BROSKY, JOHNSON and MELINSON, JJ.

MELINSON, Judge:

This is an appeal from the conviction and Judgment of Sentence in the Court of Common Pleas of Westmoreland County. We affirm.

In the early morning hours of August 4, 1986, Richard Alan Smith, the appellant at bar, was driving his car in Hempfield Township, Westmoreland County. Smith lost control of the vehicle after failing to negotiate a turn. Apparently, the car rolled several times. Smith's passenger, Joy Ellen Rothgeb, died as a result of injuries sustained in the crash. Smith was taken to Monsour Hospital for treatment of his injuries.

Troopers Robert Weaver and Bruce Petrik of the Pennsylvania State Police were dispatched to the scene of the accident to investigate. After reviewing the scene of the accident, including the dead body of Ms. Rothgeb, Trooper Weaver went to Monsour Hospital to interview Smith who was being treated for his injuries. Trooper Weaver testified that Smith smelled of alcohol, and that Smith had bloodshot and glassy eyes. Trooper Weaver advised Smith of his constitutional right to remain silent, although he did not arrest Smith. Smith refused to sign a written waiver of this right. The trooper then asked Smith for a blood sample, but Smith made no response. A nurse at the hospital instructed Smith to put out his arm and a blood sample was drawn. This occurred at 2:05 A.M. Smith's blood alcohol level at that time was .228%. (Smith's blood was drawn for medical purposes when he first came into the hospital. No blood alcohol test was performed on that sample.) Two other blood samples were drawn later into the morning, one at 2:50 A.M., and the other at 3:55 A.M. The blood alcohol levels for these two tests were determined to be .203% and .195%, respectively.[1]

At approximately 3:00 A.M., Trooper Petrik came to the hospital. He requested, and received, permission from the hospital staff to interview Smith. Smith had not been placed under arrest and was not arrested at that time. The trooper identified himself and told Smith that he was investigating the accident in which Smith was involved. According to the testimony of Trooper Petrik, Smith was not arrested at this time because the investigation was ongoing. Trooper Petrik further testified that Smith was not taken into custody and his movement was not restricted in any way. The trooper then asked Smith if Smith recalled his refusal to waive his constitutional right to remain silent and if Smith was willing to talk. According to the trooper, Smith then willingly began to answer questions about the circumstances of the accident.

---

**1.** 75 Pa.Cons.Stat.Ann. Section 3731(a)(4) is violated when an individual has a blood alcohol content of .10% or more while operating a motor vehicle in Pennsylvania.

Trooper Petrik came back to the hospital on August 6, 1986, and advised Smith of his right to remain silent. After signing a waiver of this right, Smith discussed the accident with Trooper Petrik. Smith was arrested on August 9, 1986, after his release from the hospital. He was charged with Driving Under the Influence of Alcohol, 75 Pa.Cons. Stat.Ann. Section 3731(a)(1), Homicide by Vehicle, 75 Pa. Cons.Stat.Ann. Section 3732, Homicide by Vehicle While Driving Under the Influence, 75 Pa.Cons.Stat.Ann. Section 3735, and a summary offense.

Thereafter, an omnibus pre-trial motion to suppress was filed on behalf of Smith requesting suppression of the blood test results and the statements given to Trooper Petrik. A hearing was held before the Honorable Charles H. Loughran, and after receipt of the briefs of the parties, the court denied Smith's motion. A jury trial was then held before the Honorable Bernard F. Scherer. Smith was found guilty of all charges.

Subsequently, Smith filed a motion for a new trial and/or in arrest of judgment. After briefs and argument, the motion was denied by the trial court. On February 16, 1988, Smith was sentenced to a term of imprisonment of three and one-half (3½) to seven (7) years, a Three Hundred dollar ($300) fine and court costs. This appeal followed.

Smith presents six issues on appeal, presented in his brief as follows:

I. Whether the suppression court erred in not suppressing the results of the appellant's blood tests since the withdrawals of the appellant's blood were searches conducted without a warrant at a time when the appellant was not under arrest and the appellant had not given actual consent nor was implied consent applicable.

II. Whether the suppression court erred in not suppressing appellant [sic] oral statement. Said oral statement having been transcribed into notes by Trooper Petrick [sic] on August 4, 1986. This being error since appellant's Miranda rights had not been read to

him prior to the statements, and, further, Trooper Petrick [sic] relied on Trooper Weaver's prior recitation of Miranda rights which waiver of rights was refused by the appellant.

III. Whether the trial court erred in denying appellant's request for voir dire questions, 22 thru 27, which denied the appellant the opportunity of a jury of his peers and was prejudicial.

IV. Whether the trial court erred in introducing the Monsour Hospital records reading of .195% since the blood alcohol content reading was remote in time and a violation of the doctor/patient privilege since the appellant was not aware the blood alcohol content reading was to be used for prosecutorial purposes.

V. Whether the trial court erred in not granting a mistrial since the Monsour Hospital reading of .195% was introduced as evidence when the Commonwealth did not inform the defense prior to the trial that it intended to introduce the .195% blood alcohol reading.

VI. Whether the trial court erred in not permitting the defense counsel to argue portions of the appellant's medical records which were introduced into evidence, in their entirety, without objection, in his closing arguments to the jury.

Brief for appellant at 1–2.

Smith's first two issues allege erroneous rulings by the suppression court. When the Superior Court is called upon to review the ruling of a suppression court, our initial task is to determine whether the factual findings are supported by the record. In making this determination, if the suppression court held for the prosecution, the Superior Court must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. Monarch,* 510 Pa. 138, 507 A.2d 74 (1986). Accordingly, if the suppression court's findings of fact are supported by the record we are bound by the suppression court's factual findings. *Commonwealth v.*

*Stein*, 369 Pa.Super. 409, 535 A.2d 616 (1987). It is for the suppression court as the trier of fact, rather than the reviewing court, to determine credibility. *Commonwealth v. White*, 358 Pa.Super. 120, 516 A.2d 1211 (1986). We are not bound, however, by the suppression court's conclusions of law. *White*, 358 Pa.Super. at 123, 516 A.2d 1211.

Smith's first contention regarding the propriety of the suppression court's findings concerns the blood samples drawn at the hospital. Specifically, he argues that the blood alcohol readings should not have been admitted into evidence because he had not been placed under arrest before the blood samples were drawn and that probable cause did not exist to support this warrantless search.

■ The taking of a blood sample is a search and seizure subject to the provisions of the Fourth Amendment to the United States Constitution. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Commonwealth v. Monahan*, 378 Pa.Super. 623, 549 A.2d 231 (1988). We agree with Smith that a search incident to a lawful arrest is one way to validate the taking of a blood sample, *see Schmerber*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908, however, the "implied consent" provision of the Motor Vehicle Code, 75 Pa.Cons.Stat.Ann. Section 1547(a), supports the validity of the search at bar. This section, in pertinent part, provides:

Section 1547. Chemical testing to determine amount of alcohol or controlled substance

(a) General Rule.—Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle:

(1) while under the influence of alcohol or a controlled substance or both; or

(2) which was involved in an accident in which the operator or passenger of any vehicle involved or a pedestrian required treatment at a medical facility or was killed.

Subsection (a)(1) of the above statute authorizes a chemical test of a suspect's blood, without the suspect's consent, if the officer has reasonable grounds to believe that the suspect was driving under the influence of intoxicating liquor. *Commonwealth v. Pelkey,* 349 Pa.Super. 373, 503 A.2d 414 (1985); *Commonwealth v. Cieri,* 346 Pa.Super. 77, 499 A.2d 317 (1985). Although the statute fails to define reasonable grounds, it has been construed to be the equivalent of probable cause. *Pelkey,* 349 Pa.Super. at 378, 503 A.2d 414; *Commonwealth v. Quarles,* 229 Pa.Super. 363, 324 A.2d 452 (1974). Accordingly, this court has concluded that subsection (a)(1) of the implied consent statute is constitutionally valid if probable cause existed for a police officer to believe that a suspect has been driving under the influence of alcohol or a controlled substance. *Cieri,* 346 Pa.Super. at 87, 499 A.2d 317; *Quarles,* 229 Pa.Super. at 388, 324 A.2d 452. Probable cause exists when an officer has knowledge of sufficient facts and circumstances, gained through trustworthy information, to warrant a prudent man to believe that the person seized has committed a crime. *Pelkey,* 349 Pa.Super. at 378–79, 503 A.2d 414.

Furthermore, under recent case law, as long as probable cause exists, an arrest does not have to precede a request for a blood sample. *Pelkey,* 349 Pa.Super. at 379, 503 A.2d 414; *Cieri,* 346 Pa.Super. at 89–90, 499 A.2d 317. Neither is chemical testing only valid when it occurs at the scene of the accident. Thus, in *Pelkey,* where the defendant/driver was taken to a hospital for treatment of his injuries, the blood alcohol test "performed at the hospital constituted less of an intrusion than that which constitutionally might have occurred at the accident scene." *Pelkey,* 349 Pa.Super. at 380, 503 A.2d 414. The court reasoned

that this decision was "premised on the fact that the police neither invaded nor seized and detained the individual in order to administer the test." *Id.*

■ In the case at bar, Trooper Weaver testified that Smith smelled of alcohol and that Smith's eyes were glassy and bloodshot. Trooper Weaver knew that Smith was the driver of the car from interviews with the ambulance crew. Furthermore, Trooper Weaver went to the accident scene and made a first-hand observation of the wreckage. The trooper concluded that Smith's car rolled over at least once, but more likely it rolled over several times. This court has repeatedly upheld probable cause to conduct a blood alcohol test under subsection (a)(1) of the implied consent statute where the defendant has looked and smelled like he has consumed alcohol and a serious one car or head-on accident has occurred. *See Commonwealth v. Kelly,* 365 Pa.Super. 28, 528 A.2d 1346 (1987); *Commonwealth v. Cieri,* 346 Pa.Super. 77, 499 A.2d 317 (1985); *Commonwealth v. Guiliano,* 274 Pa.Super. 419, 418 A.2d 476 (1980). Accordingly, because Trooper Weaver had probable cause to believe that Smith had been under the influence of alcohol when he was driving, the blood alcohol test performed at Monsour Hospital before Smith was arrested was valid pursuant to 75 Pa.Cons.Stat.Ann. Section 1547(a)(1).

Moreover, we find that the blood test performed at bar was valid under the tenets of Section 1547(a)(2). Here, Smith does not allege that this implied consent provision is unconstitutional; accordingly, we will not address the constitutionality of subsection (a)(2). *See Pelkey,* 349 Pa.Super. at 380, n. 2, 503 A.2d 414. Instead, he argues that the police lacked probable cause to take the blood sample because they had only the knowledge of a "possible fatality" at the time Smith's blood was taken. Smith's position is clearly belied by the notes of testimony of the suppression hearing. There, Officer Weaver testified that he saw the dead body of Joy Rothgeb at the scene of the accident.

Furthermore, even without the fatality, Officer Weaver had probable cause to order a blood test performed on

Smith.   Under subsection (a)(2), a fatal injury to a passenger is not the only circumstance warranting implied consent of a blood test of the automobile's driver;  rather, under that subsection, a blood sample may be drawn from the operator if he or any passenger requires treatment at a medical facility as a result of an accident.   75 Pa.Cons.Stat. Ann. Section 1547(a)(2).   Here, it was clear to Trooper Weaver that there had been an accident, that Smith had been the driver, and that Smith required treatment at a medical facility.   Accordingly, the trial court did not abuse its discretion in finding that Smith's Fourth Amendment rights were not violated by the blood samples taken at the hospital.

Smith's second contention is that the suppression court erred in not suppressing the statements he made to Officer Petrik at 3:00 A.M. on August 4, 1986, because Petrik did not advise Smith that Smith had a constitutional right to remain silent.   In the seminal case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court of the United States held that a suspect's privilege against self-incrimination is jeopardized when he is placed in custody or his freedom is otherwise deprived, and he is subjected to questioning.   Thus, immediately prior to undergoing a "custodial interrogation," the suspect must, in the absence of a clear, intelligent waiver of the constitutional rights involved, be advised that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed.   If the warnings are not given, any statement made during custodial interrogation cannot be used by the prosecution.   *Miranda*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

In *Commonwealth v. Chacko*, 500 Pa. 571, 577, 459 A.2d 311, 314 (1983), the Pennsylvania Supreme Court followed the mandates of *Miranda* and ruled that "[t]he test for determining whether a suspect is being subjected to custodial interrogation so as to necessitate *Miranda* warnings is whether he is physically deprived of his freedom in

any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." This court has further stated that the fact that a defendant was the focus of the investigation is a relevant factor in determining whether he was in custody; however, the fact that a police investigation has focused on a particular person no longer automatically requires *Miranda* warnings. *Commonwealth v. Fento*, 363 Pa.Super. 488, 526 A.2d 784 (1987).

In the case at bar, the suppression court held a hearing to determine whether Smith's rights were violated as a result of the interview with Trooper Petrik on August 4, 1986. After hearing the testimony of the trooper concerning the events of that morning, the court found that Smith was not deprived of his freedom of movement when the interview took place. We find that this factual conclusion is adequately supported by the record; accordingly, we find that Smith's *Miranda* rights were not violated by this interview.

Trooper Petrik went to Monsour Hospital to interview Smith in order to complete his investigation of the circumstances of the accident. At the hospital, the trooper requested permission from the hospital staff to talk to Smith. Only after receiving permission, and following a delay while Smith was being treated, did Petrik speak with Smith. Although he received two of Smith's blood samples from Trooper Weaver before the interview, the results of the samples were not made available to Trooper Petrik until the following day. Accordingly, Trooper Petrik testified that he did not arrest Smith on the morning of August 4, 1986, because the investigation of the accident was ongoing.

Trooper Petrik testified that during the interview Smith was not restricted from contact with others. In fact, the trooper testified that Smith's movement was not restricted by him in any way. Both before and after the interview, hospital personnel were able to treat Smith without interference from the police. After receiving permission to speak with Smith, Petrik did not tell the personnel that he and

Smith were not to be disturbed during the interview. Finally, the trooper testified that he specifically told Smith during the interview that Smith was not under arrest and that charges may subsequently be filed pending the outcome of the investigation.

The testimony of Trooper Petrik clearly reveals that Smith was not physically deprived of his freedom of movement at 3:00 A.M. on August 4, 1986, as a result of the questioning by Trooper Petrik. The restraint on Smith's freedom of movement was brought about by the injuries he sustained in the accident. These injuries required Smith to remain in the hospital until August 9. Thus, any restraint placed on Smith was for medical purposes by hospital personnel, rather than for investigative purposes by Trooper Petrik. *See Commonwealth v. Fento,* 363 Pa.Super. 488, 526 A.2d 784 (1987).

Based on the foregoing, although Smith was the focus of the police investigation regarding the automobile accident that took the life of Joy Ellen Rothgeb, we find that the factual finding of the suppression court that Smith was not in custody is supported by the record. Accordingly, Smith's *Miranda* rights were not violated at bar.

■ Smith next contends that the trial court erred in denying his request to ask prospective jurors certain *voir dire* questions. The questions that the trial court denied were as follows:

[1] Are you inclined to believe that it is unlawful for anyone to drive an automobile after consuming an alcoholic beverage, regardless of the quantity or its effect upon the individual?

[2] Do you believe that any person who drinks an alcoholic beverage and then drives a car has violated a law regardless of the effect upon him, or the quantity consumed?

[3] Would you be prejudiced against a person who might take a drink and then drive an automobile?

[4] Would you find this defendant guilty solely because the evidence disclosed that he had consumed an alcoholic beverage and then drove an automobile?

[5] Do you believe that the machine testing blood alcohol level is accurate, regardless of proof of proper operation?

[6] If you find the defendant's blood alcohol level was .10% or greater but you are unable to conclude beyond a reasonable doubt that this blood alcohol level was the direct cause of the accident, will you find the defendant not guilty?

The scope of *voir dire* rests within the sound discretion of the trial court and will not be reversed on appeal absent a gross abuse of discretion. *Commonwealth v. Delligatti,* 371 Pa.Super. 315, 538 A.2d 34 (1988); *Commonwealth v. Lark,* 350 Pa.Super. 558, 504 A.2d 1291 (1986). In reviewing a decision of a trial court regarding *voir dire,* the Supreme Court of this Commonwealth has stated:

It must be remembered the purpose of the voir dire examination is to provide an opportunity to counsel to assess the qualifications of prospective jurors to serve. (citations omitted). It is therefore appropriate to use such an examination to disclose fixed opinions or to expose other reasons for disqualification. (citations omitted). Thus the inquiry must be directed at ascertaining whether the venireperson is competent and capable of rendering a fair, impartial and unbiased verdict. (citations omitted).

*Commonwealth v. Drew,* 500 Pa. 585, 588, 459 A.2d 318, 320 (1983). *See Commonwealth v. Ingber,* 516 Pa. 2, 531 A.2d 1101 (1987). Furthermore,

It is equally well established that voir dire is not to be used to attempt to ascertain a prospective juror's present impression or attitudes.

'It is well-settled that the examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury.... Neither counsel for the defendant nor for the Commonwealth should be permitted to ... ask direct or hypothetical

questions designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case. While considerable latitude should be permitted on a voir dire, *the inquiry should be strictly confined to disclosing qualifications of a juror and whether a juror has formed a fixed opinion or may otherwise be subject to disqualifications for cause.'* Commonwealth v. McGrew, 375 Pa. 518, 525, 100 A.2d 467, 470 (1953) (citations omitted).

*Drew,* 500 Pa. at 589–90, 459 A.2d 318, *quoting Commonwealth v. Johnson,* 452 Pa. 130, 134, 305 A.2d 5, 7 (1973) (emphasis in original).

In the case at bar, Smith was slated to be prosecuted for having driven while intoxicated. In order to prove this, the Commonwealth intended to introduce evidence of the defendant's blood alcohol content. Clearly, the proposed *voir dire* questions in issue were designed to disclose what a juror's attitude would be toward facts that would come out in the trial of the case.

Furthermore, the questions proposed by Smith were attempts to quiz the panel members on their interpretation of the law of the Commonwealth. It is solely the function of the trial court to instruct the jury on the law and *voir dire* questions encompassing legal principles are improper. *Commonwealth v. Robbins,* 358 Pa.Super. 225, 516 A.2d 1266 (1986); *Commonwealth v. Voss,* 333 Pa.Super. 331, 482 A.2d 593 (1984). Accordingly, the trial court did not abuse its discretion in refusing to permit Smith to ask the *voir dire* questions in issue.

Smith's fourth contention is that the trial court erred in introducing the results of the blood alcohol test taken at 3:55 A.M. because the test was remote in time to the accident. He also argues that this test was a violation of the doctor/patient privilege because Smith did not know that the test was to be used for prosecutorial purposes, and he did not consent to the use of the hospital records in a

criminal prosecution. Smith, however, offers no legal authority for his position. The reason for this conspicuous absence is that Smith's contention is neither grounded in law nor in logic.

Section 3755 of the Motor Vehicle Code provides that hospital personnel shall be permitted to take blood samples from those individuals who require medical treatment in a hospital emergency room when probable cause exists to believe that the person violated Section 3731 of the Vehicle Code. Thus, when a police officer determines that probable cause exists to believe that the individual was driving a motor vehicle while under the influence, and he requests hospital personnel to obtain a blood sample, hospital personnel have an affirmative duty to perform the test and report the results to the police. 75 Pa.Cons.Stat.Ann. Section 3755; *Commonwealth v. Hipp*, 380 Pa.Super. 345, 551 A.2d 1086 (1988) (*en banc*).

Furthermore, Section 1547(j) of the Motor Vehicle Code provides that hospital personnel cannot refuse to perform chemical tests on an individual at the behest of a policeman unless unusual circumstances are present at the time the request is made. Although the Pennsylvania Department of Health regulations conflict with the Motor Vehicle Code on this issue, *see* 28 Pa.Code Sections 5.53 and 115.27, this court in a recent *en banc* opinion has found that the mandates of the Motor Vehicle Code should prevail on this issue. *Hipp*, 380 Pa.Super. at 345, 551 A.2d 1086.

At bar, we have already found that the police had probable cause to believe that Smith was intoxicated when driving his automobile on August 4, 1986. Accordingly, the trial court did not err in permitting the introduction of the blood samples taken at the hospital at the behest of the Pennsylvania State Police.

Furthermore, logic undermines Smith's argument that the extended period of time between the accident and the fourth blood sample taken provides for the preclusion of the sample into evidence. Four blood samples were taken from Smith. The only blood test that he objects to here was the

last blood test, taken at approximately 3:55 A.M.. This test was performed at least two hours after the accident occurred. Smith's blood alcohol reading from this test was .195%, which was lower than the other three test results. Section 3731(a)(4) of the Motor Vehicle Code states that "a person shall not drive, operate or be in actual physical control of the movement of any vehicle while ... the amount of alcohol by weight in the blood of the person is 0.10% or greater." This court has found that this rule specifies the quantum of proof which is legally sufficient to sustain the Commonwealth's burden of proof of this element of the crime of driving while intoxicated. *Commonwealth v. Hernandez*, 339 Pa.Super. 32, 488 A.2d 293 (1985). Here, the Commonwealth had already performed two blood tests on Smith taken closer to the time of the accident. If Smith was to have a blood alcohol content over .10%, it was clearly more likely to be from one of these two samples, not from the final test taken over two hours after the accident occurred. If Smith's blood alcohol content was over .10% from one or both of these samples, then the Commonwealth would have already obtained evidence which was legally sufficient to prove that Smith's blood alcohol level was over the legal limit when he was driving. If both of the first two tests revealed that Smith had a blood alcohol level below .10%, then, obviously, the final sample would also have a blood alcohol level below .10%. Accordingly, in either scenario, the importance of the results of the final blood test performed on Smith would have been *de minimis.*

■ Smith's fifth contention is that the trial court erred in not granting a mistrial because the Commonwealth did not inform the defense before trial that it intended to introduce the results of Smith's final blood test. The record belies this contention.

The records custodian of Monsour Hospital was subpoenaed for the suppression hearing held in this case. Smith was given access to his medical records before the hearing. Additionally, a copy of these records was provided to the defense after the suppression hearing. The medical records

included the reports on all of the blood alcohol tests performed on Smith and subsequently used at trial by the Commonwealth. The records were submitted to the defense in their entirety before trial began. Accordingly, the trial court did not err in denying Smith's request for a mistrial regarding this contention.

■■■ Smith's final allegation is that the trial court erred in not permitting the defense to argue opinion portions of Smith's medical records in its closing argument to the jury. Specifically, the defense attempted to argue in its closing that an attending physician had examined Smith and had written on a summary sheet that Smith appeared alert and oriented and that his answers to questions were coherent.

Under the business records exception to the hearsay rule, hospital records have been admitted into evidence to show the fact of an individual's hospitalization, the treatment prescribed, and the symptoms found. *Williams v. McClain*, 513 Pa. 300, 520 A.2d 1374 (1987); *Commonwealth v. DiGiacomo*, 463 Pa. 449, 345 A.2d 605 (1975). A medical opinion contained in a hospital record, however, which is offered as expert testimony has been held to be inadmissible unless the doctor who prepared the report is available for in-court cross-examination regarding the accuracy, reliability, and veracity of his opinion. *Commonwealth v. Jackson*, 367 Pa.Super. 6, 532 A.2d 28 (1987).

Here, Smith did not even attempt to introduce the opinion of the treating physician during the course of the trial. At that time, the opinion would only have been admissible if the treating physician was available to be cross-examined by the Commonwealth regarding his opinion. Instead, Smith attempted to introduce the opinion during his closing argument, a time when no cross-examination is permitted. Clearly, the trial court did not err in precluding the defense from arguing the opinions contained in Smith's medical records in its closing to the jury.

Judgment of Sentence affirmed.